In re William T. MOHN, Jr., Debtor.

Mary Louise MOHN, Plaintiff,

v.

William T. MOHN, Jr., Defendant.

Bankruptcy No. 88–01023.
Adv. No. 88–0556.

United States Bankruptcy Court,
E.D. Virginia,
Alexandria Division.

Aug. 28, 1990.

Henry Counts, Jr., Alexandria, Va., for debtor.

Stephen E. Leach, Carol Hoshall, Tucker, Flyer, Sanger & Lewis, Washington, D.C., for Mary Louise Mohn.

## MEMORANDUM OPINION

MARTIN V.B. BOSTETTER, Jr., Chief Judge.

This matter comes before us on remand from the United States District Court for the Eastern District of Virginia, Alexandria Division, for an articulation of factual findings that support our April 10, 1989 bench ruling in which we discharged both the debtor's obligation to pay his former wife $1000 per month for 209 months from his military pension proceeds, and his obligation to maintain a $50,000 life insurance policy on his life, naming his former wife as beneficiary.

On August 25, 1988 Mary Louise Mohn filed a complaint in this Court to determine the dischargeability of certain debts of her former husband, William Mohn. These debts included Mr. Mohn's obligation to make alimony payments of $500 per month for sixty months; an obligation to pay Mrs.

Mohn $1000 per month for 209 months from his military pension; and an obligation to maintain a $50,000 insurance policy on his life, with Mrs. Mohn as the sole beneficiary under the policy.

At the April 10, 1989 trial on the dischargeability of these debts, the debtor agreed that the alimony payments of $500 per month for sixty months were not dischargeable in bankruptcy. The issues at trial, therefore, centered around whether the military pension payments and the insurance obligation were nondischargeable debts under section 523(a)(5)(B) of the United States Bankruptcy Code ("Code"), which provides that debts in the nature of alimony, maintenance or support are nondischargeable.[1] After that hearing, we ruled that the pension payments and life insurance obligation were dischargeable debts that were not intended by the parties to be alimony, maintenance or support.

Mrs. Mohn appealed our ruling to the United States District Court for the Eastern District of Virginia, Alexandria Division, which remanded the case to this Court for an articulation of factual findings to support our April 10, 1989 ruling. After reviewing the record of the April 10, 1989 trial and finding it to be incomplete on the issue of the parties' intent with respect to the agreement, this Court held a further factual hearing on July 20, 1990. After careful consideration of the additional and more complete record, and for the reasons set forth below, we now find that both the military pension obligation and the insurance obligation are nondischargeable debts pursuant to section 523(a)(5)(B).

■ Section 523(a)(5)(B) provides that a debtor is not discharged from any debt

(5) to a spouse, former spouse, or child of the debtor, for alimony to, maintenance for, or support of such spouse or child, in connection with a separation agreement, divorce decree or other order of a court of record, determination made in accordance with State or territorial law by a governmental unit, or property

---

1. *See infra,* text at 52–53 (providing full text of section 523(a)(5)(B)).

settlement agreement, but not to the extent that—

(B) such debt includes a liability designated as alimony, maintenance, or support, unless such liability is actually in the nature of alimony, maintenance, or support[.]

11 U.S.C. § 523(a)(5)(B). The legislative history to this section makes clear that "[w]hat constitutes alimony, maintenance, or support, will be determined under the bankruptcy laws, not State law." *See* H.R. Rep. No. 595, 95th Cong., 2d Sess., *reprinted in* U.S.Code Cong. & Admin. News, 5787, 5963, 6320. The burden of proving that an obligation is "actually in the nature of alimony, maintenance or support" is on the plaintiff spouse. *See Tilley v. Jessee,* 789 F.2d 1074, 1077 (4th Cir.1986).

■ The Fourth Circuit has made it clear that "the proper test of whether the payments are alimony lies in proof of whether it was the intention of the parties that the payments be for support rather than as a property settlement." *Melichar v. Ost,* 661 F.2d 300, 303 (4th Cir.1981) (citing *Shacter v. Shacter,* 467 F.Supp. 64 (D.Md.1979), *aff'd without published opinion,* 610 F.2d 813 (4th Cir.1979); *Nichols v. Hensler,* 528 F.2d 304 (7th Cir.1976); 3 Collier on Bankruptcy ¶ 523.15, at 523–111 (1981 ed.)). Intent is the threshold issue that must be crossed before other concerns become relevant. *See Tilley,* 789 F.2d at 1078 n. 4.[2] Intent, as the Fourth Circuit has stressed, must be mutual as opposed to one spouse's unilateral efforts to obtain additional support. *Id.* at 1078 (finding that obligation created by postnuptial agreement was not in nature of alimony, based in part on fact

that the testimony failed to reveal the shared intent of both parties to make the obligation alimony). The Fourth Circuit further has stressed that although the true intent of the parties, rather than the labels attached to an agreement, controls, a court should not avoid consideration of the parties' agreement as persuasive evidence of intent. *Id.* at 1077. With these considerations in mind, we review the testimony at the April 10, 1989 trial along with the basis for our initial ruling.

Turning first to the April 10, 1989 dischargeability trial, we note that neither Mrs. Mohn nor the attorney for Mr. Mohn were asked to testify and the only substantial testimony came from Mrs. Mohn's divorce attorney, Arnold Schweizer. Schweizer's testimony revealed that the Mohns had been married for approximately 30 years when the couple sought a divorce. Mrs. Mohn, who was 55 years old at the time, had never been employed during her 30 year marriage, and had stayed home to raise the couple's three children. Mr. Mohn, who is a retired Air Force Colonel with a Ph.D. in international relations, started his own consulting firm upon leaving the military.

In describing his representation of Mrs. Mohn in the divorce action, Mr. Schweizer related that he instituted a bill of complaint for divorce and obtained a "show cause" order, which expeditiously set a hearing on the issues of alimony, and use and possession of the home. In preparation for filing the complaint, Schweizer gathered Mrs. Mohn's financial information which he testified revealed that her expenses were approximately $1500 per month.[3]

---

2. In *In re Coffman,* 52 B.R. 667, 674–75 (Bankr. D.Md.1985), the court listed eighteen factors that a court may consider in determining whether an obligation is alimony. The importance of these additional factors in a determination of whether an obligation is alimony pursuant to section 523(a)(5)(B), however, has not been ruled upon by the Fourth Circuit. *See Tilley,* 789 F.2d at 1078 n. 4 (expressing no position with respect to the importance of factors cited by the district court to determine whether award was in the nature of alimony).

3. From the testimony, the precise breakdown of Mrs. Mohn's expenses is not clear. On this point, Mr. Schweizer testified:

She informed me that, one, she obviously had no income, so we had no income down for her. She indicated to me what her assets were, which were the marital home—that was the home the two of them owned as husband and wife. She drove an automobile and she had some clothes. She also indicated to me what her anticipated expenses would be for residing in the house or taking care of herself. The Mohns had obtained two mortgages. They had an original mortgage, I believe, with Leader Mortgage, and then there was a sec-

At this show cause hearing in the state court, the Master called the parties into chambers, discussed what action he contemplated taking, and then recommended that Mrs. Mohn be awarded alimony *pendente lite* in the amount of $500 per month. Subsequent to this hearing, the parties began settlement negotiations,[4] which culminated in an agreement that was signed by Mr. and Mrs. Mohn on March 17, 1988.[5]

The critical provisions of that agreement are paragraphs 24 and 25, relating to the parties' intent with respect to the military pension payments. Paragraph 24 of that agreement provides in pertinent part:

Both parties agree that paragraph 25 ... [was] entered into with the intent to maintain the Wife in a similar position as she had previously maintained during their marriage, and to help with wife's living expenses after the divorce. The parties also agree that paragraph 25 ... [was] entered into in discharge of the Husband's duty to support the Wife rather than as a property settlement.

Paragraph 25, in turn, provides in part:

The parties agree that Mrs. Mohn's share of the military pension of Dr. Mohn is in the amount of $209,000 (Two Hundred Nine Thousand Dollars). Dr. Mohn will pay from his retirement to Mrs. Mohn the gross sum of $1,000 (One Thousand Dollars) per month for a period of 209 (Two Hundred Nine) months. The first payment is due on the 5th day of each month immediately after approval by the Department of Defense, United States Air Force.

---

ond mortgage taken out to help finance Dr. Mohn's business, and that, I believe, was with First Washington. So there were two mortgages, approximately about $800 a month for those two payments.

Mrs. Mohn had a food expense, obviously. She would have to buy food for herself. She had a broken-down automobile and a very old Lincoln, I believe, and that not only required quite a bit of gas because it was a gas guzzler, but it had about a thousand dollars a year in expenses for the car, she was anticipating. Because she had discussed with Dr. Mohn previously their separation about going and becoming a real estate sales person, and she had obtained her license, and so she also had the additional expense of going out and getting herself a brand new wardrobe of clothes in order to be in business.

Her approximate expenses, if I recall, a month was [sic] about $1500.

Transcript of Trial, April 10, 1989 at 7–8 [hereinafter "1989 Transcript"].

4. With respect to these settlement discussions, Schweizer testified:

In November of 1987 after deposition Dr. Mohn and his counsel and myself had a conference for about an hour to an hour-and-a-half in which we discussed trying to resolve the issues in this case. Basically, what the discussion was was that we were going to give Mrs. Mohn alimony for a period of time, that she was going to get the money from the military retirement. We had had the military retirement evaluated, and the value was $418,-000. Based on our economist's determination, her share would have been about $209,-000. Those were matters that we discussed. We also discussed, because alimony would end upon Dr. Mohn's death and because the military pension would cease on Dr. Mohn's death, and because my client and her family

and myself had some concerns about Dr. Mohn's health, we insisted in negotiations that some life insurance policies be provided because of her financial situation and because she was just starting out in business. We felt that if he died prior to all the monies being received, that it would put her at great financial distress. So we wanted to insist that there be some life insurance policies provided in case he passed away.

What we wanted was for Dr. Mohn to provide her with a hundred thousand dollars of life insurance. That was not acceptable to Dr. Mohn. We then went through November into early December, still attempting to discuss the matter. Trial was scheduled for the 4th of December 1987, and we had a pre-trial scheduled for December 3, '87. Keith Schiszik, myself, and Dr. Mohn sat out in the ante room to Judge Casula for about three hours, again going over the same issues.

After three hours of negotiations we finally came to a resolution. That was as indicated in that agreement, which was $500 a month alimony for a specific period of time, $209,-000 of military pension to be paid at a thousand dollars a month so that she would have continuing income, and he would provide for her a $50,000 life insurance.

1989 Transcript at 12–14.

5. This agreement was incorporated in a May 3, 1988 Amended Judgment, which provides that the terms and provisions of the agreement are incorporated into the decree but are not merged. As Schweizer explained, this language indicates that the court granting the Amended Judgment has jurisdiction over the agreement and an action for contempt can be filed for not complying with the agreement, and a complaint can be filed to enforce the agreement.

With respect to the agreement, Schweizer testified that he intentionally drafted it in such a way that the pension payments could be interpreted only as alimony and not a property settlement. Explaining his reasons in drafting the settlement agreement as he did, Schweizer testified:

> I do bankruptcy work, and I was aware of the fact that there was a potential for discharge of this obligation. Mrs. Mohn needed this money to support herself to get herself on her feet, and I wanted to make sure that this could not be interpreted as a property settlement agreement. I drew the whole agreement up, trying as best I could to keep the words "property settlement agreement" out because that is not what we intended to do. I specifically told [Mr. Mohn's attorney] that I was putting this provision in there so that it could not be interpreted later on as anything but support. I wrote it that way. It was in the initial draft. It was in the agreement as written. Everyone read it and understood it.

1989 Transcript at 18–19. At the close of Schweizer's testimony, Mr. Mohn was called as an adverse witness and testified briefly that he had not yet taken out the insurance policy on his life pursuant to the settlement agreement.[6]

At the end of closing arguments, this Court ruled that both the military pension obligation and the insurance obligation were not intended to be alimony, maintenance or support but were in the nature of a property settlement. Although we were aware that paragraph 24 of the agreement states that "[b]oth parties agree that" the pension payments were intended to be for Mrs. Mohn's support rather than as a property settlement, we were also mindful of the Fourth Circuit's admonition that the true intent of the parties, rather than the labels attached to an agreement controls. *See Tilley,* 789 F.2d at 1077; *Melichar,* 661 F.2d at 303. Assuming *arguendo* that the language in paragraph 24 is more than just a "label" and approaches the "structured drafting" in *Tilley* that the Fourth Circuit ruled was a "substantial obstacle" to be overcome, the agreement standing alone still is not determinative on the issue of the parties' intent.[7]

Cognizant of these standards, we based our ruling at the first hearing in part on the lack of conclusive evidence proffered on Mr. Mohn's intent with respect to the obligations at issue in the agreement. Although Arnold Schweizer, Mrs. Mohn's divorce attorney, testified with respect to both Mrs. Mohn's intent to obtain support payments, and his own intent to draft the agreement in such a way that the military pension payments could not be construed as a property settlement, this Court found Schweizer's testimony to have little probative value in demonstrating that paragraphs 24 and 25 did indeed embody Mr. Mohn's intent that the pension payments be used to support Mrs. Mohn. In fact, Schweizer's testimony with respect to drafting the agreement appeared to reflect Mrs. Mohn's unilateral efforts to obtain support payments and Schweizer's attempt to insure that those payments were not dischargeable in bankruptcy.[8]

Furthermore, we found that the testimony proffered with respect to Mrs. Mohn's needs was inconclusive. Specifically, although Schweizer testified that Mrs. Mohn's living expenses were $1500 per month, he also testified that she had obtained her real estate license and that she began after the *pendente lite* hearing trying to sell real estate. As a result of the inconclusive testimony regarding Mrs. Mohn's needs and the lack of probative

---

6. On cross-examination Mr. Mohn also stated that when he signed the agreement, he did not have reasons to consider filing a bankruptcy petition.

7. *See Tilley* 789 F.2d at 1078 ("While the agreement could not, as we have stated, be determinative on the issue [of intent], we conclude that it erected a substantial obstacle which [the appellee] was required to overcome.").

8. *See Tilley,* 789 F.2d at 1078 (finding that obligation created by post-nuptial agreement was not in nature of alimony, based in part on fact that the testimony failed to reveal the shared intent of both parties to make the obligation alimony).

testimony on Mr. Mohn's intent with respect to the agreement, we found that Mrs. Mohn did not meet her burden of demonstrating that the obligations at issue more likely than not were intended to be alimony, maintenance or support.

██ Because this Court determined that a proper decision on remand could only be reached through a more complete record,[9] we set this matter for a further factual hearing to adduce evidence on Mr. Mohn's intent with respect to the agreement. At this hearing, both Mr. and Mrs. Mohn and their divorce attorneys testified. The testimony on remand makes clear under any standard that both parties mutually intended that the military pension payments, as well as the insurance obligation, be for Mrs. Mohn's support.

First, the evidence establishes conclusively that Mrs. Mohn needed $1500 per month for her support.[10] She testified that during her thirty year marriage she was never employed outside the home and that her husband was the sole source of income. Moreover, around the time of the divorce settlement, Mrs. Mohn had "come about two years" from a life-threatening cancer operation and now "survives year to year." It was clear from her testimony that at the time of the settlement negotiations all of the parties were aware that Mrs. Mohn's health impacted upon her ability to support herself. Mrs. Mohn's physical condition, combined with her lack of insurance, trust funds, annuities, income from stocks or bonds, or expected inheritance establish conclusively that her financial situation is indeed grave.

Turning next to the issue of Mr. Mohn's intent with respect to the military pension payments, we find that the testimony of Keith Schiszik, Mr. Mohn's divorce attorney, is probative on this point. Schiszik

testified: "Just in going through my notes, it seemed as though Mrs. Mohn's offers or demands in the case were always that she needed $1,500 per month, and she was—*we agreed on this $500 figure, and, therefore, we agreed on the further $1000 for her to have a total of $1,500 per month.*" 1990 Transcript at 16 (emphasis supplied). Schiszik testified further:

> To a large extent, I didn't care [why paragraph 24 was put in the agreement].... Mrs. Mohn's attorney, Arnold Schweizer, I believe had a very difficult situation on his hands. He had a very difficult client to deal with, and he wanted to make sure that she was satisfied with everything in the agreement, as did I.
>
> *I think that Dr. Mohn wanted to make sure that everything was finally taken care of, that everything went smoothly, and that her concerns were basically taken care of, as well. So we came up with this two-fold, two-tier approach, part of his pension, and part of it alimony.* And I felt that further on in the paragraph, later on in one of the paragraphs, it says the total amount of alimony to be paid is $30,000, unless he wants to prepay it, in which case it's 20."

1990 Transcript at 19–20. Schiszik's statements that "we agreed on the further $1000 for her to have a total of $1500 per month" and that Mr. Mohn wanted to make sure that "her concerns were basically taken care of" make clear that the pension payments were intended by Mr. Mohn to be for Mrs. Mohn's support. Furthermore, Mr. Mohn, who was called to the stand by his counsel, had ample opportunity to refute this portion of Schiszik's testimony. In the face of Mr. Mohn's silence on the issue of his intent with respect to the military pension obligation, this Court can only

---

**9.** Our decision to hold a further factual hearing on remand was based in part on the desire to reduce the potential for "piecemeal litigation" in the event of further review of this matter and to clarify what this Court finds to be an incomplete and conflicting record. Although the district court's remand order did not mandate a further evidentiary hearing, it did not prohibit such a hearing. *See* Order of United States District Court for the Eastern District of Virginia, Alexandria Division, Civil Action No. 89–0995–A (September 29, 1989).

**10.** Mr. Mohn's divorce attorney himself acknowledged that Mrs. Mohn needed $1500 a month to "make her ends meet." Transcript of Trial on Remand, July 20, 1990 at 23 [hereinafter "1990 Transcript"].

conclude, based on the unrefuted testimony, that Mr. Mohn intended the military pension payments to be for the support of Mrs. Mohn.

■ Turning last to the insurance obligation and considering Mrs. Mohn's physical condition at the time of the divorce, we find that it is in the nature of security for payment of Mrs. Mohn's support and thus is nondischargeable pursuant to section 523(a)(5)(B). *See In re Grijalva*, 72 B.R. 334, 337 (S.D.W.Va.1987) (upholding bankruptcy court's ruling that debtor's obligation to maintain an insurance policy on his life was nondischargeable under section 523(a)(5) on basis that policy was a "safety net" of child support and alimony payments); *In re Lineberry*, 9 B.R. 700, 709 (Bankr.W.D.Mo.1981) (finding that debtor's obligation to maintain an insurance policy on his life was nondischargeable under section 523(a)(5) based in part on fact that insurance was "obviously in the nature of security for payment of support and maintenance."). In view of Mrs. Mohn's health and the clear and unrefuted testimony that Mrs. Mohn had virtually no means to support herself other than the alimony and pension payments and in light of Schiszik's testimony that Mr. Mohn wanted to see that Mrs. Mohn's concerns were taken care of, we are compelled to find that the insurance obligation was intended to be a "safety net" of the alimony and pension payments.

After careful consideration of the testimony at the hearing on remand and for the reasons stated above, we now find that Mr. Mohn's obligation to pay Mrs. Mohn $1000 per month for 209 months from his military pension proceeds and his obligation to maintain a $50,000 life insurance policy on his life with Mrs. Mohn as the beneficiary are nondischargeable debts under section 523(a)(5)(B) of the Code.

An appropriate order will enter.